UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BIKRAMJIT SINGH, KULDIP DEOL, AND DALJEET KAUR, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 3-07CV0378-D |
| CHOICE HOTELS INTERNATIONAL, INC., | § § § | |
| *Defendant.* | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**

Plaintiffs oppose Defendant's Motion to Compel Arbitration and Dismiss or Stay Litigation as unconscionable and present the attached brief and evidence in support of their opposition.

Respectfully submitted,

_____
David R. Gibson
Texas Bar No. 07861220
445 E. FM 1382, Ste. 3363
Cedar Hill, TX 75104
(214) 697-3034
(972) 291-0636 Facsimile

**ATTORNEY FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BIKRAMJIT SINGH, KULDIP DEOL, AND DALJEET KAUR, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 3-07CV0378-D |
| CHOICE HOTELS INTERNATIONAL, INC., | § § | |
| *Defendant.* | § § | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**

The arbitration clause at issue in this case is unconscionable and should not be enforced. If it is Plaintiffs will be denied a remedy because the cost of arbitration is simply too great to bear.

## Background Facts

1.     Plaintiffs and Defendant entered into a Franchise Agreement effective February 18, 2003, pursuant to which Plaintiffs would operate a hotel in Amarillo, Texas under the Quality Inn logo. The term of the Franchise Agreement was 20 years after the "Opening Date," which is defined in the Agreement as the date that Plaintiffs begin to rent sleeping rooms to the public. Each party to the Franchise Agreement had the unfettered right to terminate the agreement, with or without cause, on the 5th, 10th and 15th anniversary of the Opening Date with prior written notice. The prior written notice required was to be given 12 months in advance of the proposed termination date if given by Defendant.

2.     Upon execution of the Franchise Agreement, Plaintiffs were required to and did in fact pay a non-refundable "Affiliation Fee" of $35,000.00. Thereafter, Plaintiffs were required to

and did in fact pay a monthly "Royalty Fee" of 4.0% of the preceding month's gross room revenues, a monthly "Marketing Fee" of 2.1% of the preceding month's gross room revenues, and a monthly "Reservations Fee" of 1.75% of the preceding month's gross room revenues. These fees are referred to in the Franchise Agreement as the "Monthly Fees." Plaintiffs timely paid all Monthly Fees.

3.      In return for Plaintiffs' payment of the Monthly Fees and the Affiliation Fee, Plaintiffs were to receive the benefit of Defendants' extensive marketing program and its advance reservation system, in addition to the good will associated with the Quality Inn logo. Plaintiffs in turn had an extensive list of obligations under the Franchise Agreement, which they were required to and did in fact perform.

4.      As a material part of their inducement to enter the Franchise Agreement, Defendant promised Plaintiffs that they would be permitted to operate as the "Quality Inn and Suites Airport," which would indicate to the public that Plaintiffs' hotel was the closest Quality Inn to the Amarillo International Airport. Plaintiffs' hotel was also to be included in Choice Hotels' nationally-distributed "tour book" with the "Airport" designation. The "airport" designation provided Plaintiffs a material competitive advantage over other non-airport hotels, including other Choice Hotels located in Amarillo.

5.      With the exception of the termination permitted on the 5th, 10th and 15th anniversary of the Opening Date, the Franchise Agreement permitted Defendant to terminate the agreement only in certain limited circumstances:

    b. Termination By Us [Choice Hotels].

    1. Termination with Notice. If you default in your material obligations under this Agreement, we may terminate this Agreement, effective on the date stated in our notice (or the earliest date permitted by applicable law) as follows:

(a) If you do not pay us fees or other amounts due under this Agreement or file required monthly reports of Gross Room Revenues, within 10 days of our written notice of default to you;

(b) If you do not cure fully any other breach of your obligations or warranties under this Agreement, within 30 days of our written notice of default to you; or

(c) If you or an affiliate of you materially breaches any other agreement with us or our affiliates, or any mortgage, deed of trust or lease covering the Hotel, unless cured within any applicable notice or grace periods contained in those documents.

2. <u>Immediate Termination Effective on Notice</u>.  Upon written notice to you, we may terminate this Agreement immediately, without giving you an opportunity to cure the default, if:

(a) There is an imminent threat or danger to public health or safety resulting from Hotel construction, maintenance, or operation;

(b) You stop operating the Hotel as part of the System, you abandon the Hotel, you lose the right to possess the Hotel, you tail to open the Hotel in accordance with this Agreement, or you forfeit the right to do or transact business in the jurisdiction in which the Hotel is located;

(c) You (or a beneficial owner of you owning at least 5% of you) are convicted of a felony, a fraud, a crime involving moral turpitude or any other crime or offense that we reasonably believe is likely to have an adverse effect on the System, the Marks, our goodwill, or our interest in this Agreement;

(d) You (or a beneficial owner of you) transfer or purport to transfer any rights or obligations under this Agreement, any Controlling Interest in you, your interest in the Hotel or more than a 50% undivided interest in the Hotel without our prior written consent;

(e) You knowingly maintain false books or records, send, us false reports, or make any materially false statement in your franchise application;

(f) You do not keep the Hotel continuously open to the public as part of the system;

(g) You become insolvent or make a general assignment for the benefit of creditors or are unable to pay your debts to creditors on a timely basis;

(h) You do not buy, maintain or send us evidence of insurance required by this Agreement; or

(i) We send you 2 or more written notices of default under this Agreement for the same or a similar cause or reason in any consecutive 12 month period, whether or not cured.

6.  During their first year of operation, 2003, as Quality Inn and Suites Airport, Plaintiffs earned gross revenue of $1,296,202.72.

7.  In 2004, for reasons unknown to Plaintiffs and without their consent, Defendant dropped the "Airport" designation from Plaintiffs' hotel in Defendant's 2004 "tour book." Thus, rather than being listed as "Quality Inn and Suites Airport," Plaintiffs' hotel was simply listed as a "Quality Inn & Suites." As a direct and proximate result of that change in designation, Plaintiffs' gross revenue fell to $1.03 million.

8.  In 2005, Defendant listed another of its Quality Inn franchisees in Amarillo as an "airport" location, and again for reasons unknown to Plaintiffs and without their consent, listed Plaintiffs' hotel simply as a "Quality Inn & Suites." Moreover, the other Quality Inn that was listed as an "airport" location is approximately 7.5 miles from the airport, whereas Plaintiffs' hotel is only three miles from the airport. Addendum No. 1 to the Franchise Agreement expressly provides that the secondary name "Airport" may only be used if the hotel is located with five miles of the airport. As a direct and proximate result of these actions on Defendant's part, Plaintiffs' gross revenue dropped to $969,741.98 in 2005. Defendant ultimately restored the "airport" designation in 2006, but the damage to Plaintiff's franchise had already been done.

9.  Plaintiff's hotel was subject to periodic inspection by Defendant. Prior to complaining about losing the "airport" designation, Plaintiff's hotel never failed an inspection. Shortly after complaining about that lost designation, however, in September 2005, Defendant inspected Plaintiffs' hotel, gave it a failing grade for the first time, and instructed Plaintiff to make

repairs and modifications costing in excess of $100,000. On approximately February 2, 2006, Defendant suspended reservation and marketing services to Plaintiff's hotel effective immediately and notified Plaintiffs of certain alleged defaults arising out of the "failed" September inspection. Because of the decline in Plaintiffs' revenues caused by Defendant, Plaintiff was unable to make all of the changes in the time permitted by Defendant and requested 90 days in which to do so. Defendant ignored that request and, by letter dated April 10, 2006, terminated its franchise relationship with Plaintiffs.

## Issues Before the Court

10. Defendant has moved for an order compelling arbitration under the Federal Arbitration Act and the substantive law of Maryland, relying on an arbitration provision in the Franchise Agreement, which provides in part as follows:[1]

> [A]ny controversy or claim arising out of or relating to this Agreement, or the breach of this Agreement, … as well as any claim that we violated any laws in connection with the execution of this Agreement … will be sent to final and binding arbitration before either the American Arbitration Association or J.A.M.S./Endispute in accordance with the Commercial Arbitration Rules of the American Arbitration Association… .

11. Plaintiffs do not dispute the existence of the arbitration clause nor do they dispute that their claims fall within its scope. Plaintiffs do, however, contend that Defendant's arbitration clause is unconscionable and unenforceable for six independent reasons: (1) it requires arbitration at Defendant's headquarters in Maryland; (2) it is binding only on Plaintiffs; (3) it precludes any discovery except at Defendant's election; (4) it precludes Plaintiffs from bringing any claims under Maryland's Franchise Registration and Disclosure Law; (5) its cost denies Plaintiffs any remedy;

---

[1] The full text of Defendant's arbitration clause is set forth in Exhibit A to Defendant's motion beginning at page 13. The shockingly one-sided and unconscionable nature of that clause is evident upon first reading.

and; (6) it impermissibly denies Plaintiffs' constitutional right to a trial by jury.

## Unconscionable Arbitration Agreements Are Unenforceable.

The purpose of the Federal Arbitration Act was to "place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). In that regard, the Act expressly provides that arbitration agreements "shall be valid, irrevocable, and enforceable, ***save upon such grounds as exist at law or in equity for the revocation of any contract***." 9 U.S.C. § 2 (emphasis added). Thus, as confirmed by the United States Supreme Court, equitable defenses are available to a party challenging an arbitration agreement. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) ("generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening [the Federal Arbitration Act]"); *Gilmer*, 500 U.S. at 33 ("courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract'") (citation omitted). In sum, if Defendant's arbitration clause is unconscionable under Maryland's common law of contracts, then the Federal Arbitration Act expressly permits this Court to refuse its enforcement.

Not surprisingly, Maryland courts – like those in Texas –will ***not*** enforce unconscionable contracts. *See Williams v. Williams*, 306 Md. 332, 508 A.2d 985 (1986) (refusing to enforce a separation agreement where its oppressive terms shocked the conscience of the court); *Straus v. Madden*, 219 Md.535, 150 A.2d 230 (1959) (rescinding real estate contract that was substantively unfair and resulted from gross bargaining inequality); *McCarty v. E.J. Korvette, Inc.*, 28 Md. App. 421, 431-34, 347 A.2d 253, 260-62 (1975) (finding unconscionable consumer contract provision that

limited remedies to exclude consequential damages for personal injury and property damage in conflict with express product warranty). *See also Leet v. Totah*, 329 Md. 645, 661, 620 A.2d 1372, 1380 (1993) (recognizing unconscionability as grounds for refusing to enforce contract terms); *Gladding v. Langrall, Muir & Noppinger*, 285 Md. 210, 213, 401 A.2d 662, 664-65 (1978) (recognizing that unconsionability may justify contract rescission).

In this regard, the law of Maryland and Texas are in accord:

> The doctrine of unconscionability can be applied to arbitration provisions in the same manner as it applies to other contracts. *See In regarding FirstMerit Bank, N.A.*, 52 S.W.3d 749,756 (Tex. 2001). The burden is on the party seeking to avoid the arbitration provision. *Id.* The basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, *the clause involved is so one-sided* that it is unconscionable under the circumstances existing when the parties made the contract. *FirstMerit Bank,* 52 S.W.3d at 757. Its purpose is not to disturb the allocation of risks because of superior bargaining power, but to prevent oppression and unfair surprise. *See id.*

*AutoNation USA Corp. v. Leroy,* 105 S.W.3d 190, 198 (Tex. App.–Houston [14th Dist.] 2003, orig. proceeding).

The Maryland Court of Appeals has looked to both procedural and substantive issues in evaluating the unconscionability of a contract. *Williams*, 306 Md. at 340-41, 508 A.2d at 989-90 (where substantive inequity is accompanied by procedural defects like inequality in bargaining power or oppression, equitable relief is more readily granted), *quoting Straus*, 219 Md. at 543-44, 150 A.2d at 235. Under § 2-302 of the Commercial Law Article of the Maryland Code, authorizing courts to invalidate unconscionable contract terms for the sale of goods, the Official Comment suggests the applicability of this analysis, stating: "The basic test is whether...the clauses involved are so one-sided as to be unconscionable...The principle is one of the prevention of oppression and unfair surprise." MD. CODE ANN., COM. LAW I. § 2-302.

**Defendant's Arbitration Clause Is So One-Sided as to Be Unconscionable.**

1.       **Arbitration to Occur at Defendant's Headquarters.**

Defendant's arbitration clause provides that "Any arbitration will be conducted at [Defendant's] headquarters in Maryland." From the outset then, Defendant would be afforded a psychological, practical and economic advantage over Plaintiffs.

From a psychological standpoint, Plaintiffs would be guests in their enemy's lair. They will be at Defendant's mercy for conference rooms, bathrooms, break rooms, and, most importantly, privacy. Regardless of any protestations to the contrary, Plaintiffs would have no assurance that their privileged conversations were not being overheard or monitored. Even without ascribing improper motives to Defendant, to suggest that eaves-dropping is not widespread in corporate America would simply be naïve.

From a practical standpoint, Defendant's personnel involved in the arbitration would enjoy the comfort and convenience of their own offices and their own homes, whereas Plaintiffs would have to endure the inconvenience and expense of lodging and board. Those expenses alone could approach $10,000 for Plaintiffs, their witnesses, and their counsel, none of whom live in Maryland. *See* Affidavit of David R. Gibson, Ex. C hereto at ¶ 6. Those are, of course, expenses that Defendant would not have to incur.[2] Moreover, the Court should not underestimate the sheer physical drain of traveling to Maryland, living out of a hotel, and eating at restaurants. While those activities might be fun on a vacation, they are nonetheless exhausting. Under Defendant's arbitration clause tough, only Plaintiffs would be required to bear that burden.

_____

2 It is not unlikely that if this case were compelled to arbitration that Defendant would retain counsel in Maryland, such that not even Defendant's current counsel would have to travel to Maryland.

For the same reasons that every sports franchise wants the home court advantage in the playoffs – minus the roar of the crowd – Defendant wants that advantage here as well. Home court would give Defendant a significant cost advantage, a psychological advantage, and a human advantage, ensuring that Plaintiffs alone would suffer the physical and economic burden of travel. Such one-sidedness, especially given the relative size and wealth of the parties, is unconscionable.

## 2.  Arbitration Optional for Defendant, Mandatory for Plaintiff.

Defendant's arbitration clause makes arbitration optional for Defendant, but mandatory for Plaintiff. To wit –

> ***Except for our claims against you for indemnification, actions seeking to enjoin you from using the Marks in violation of this Agreement, or, at our option, actions for collection of moneys owed us under this Agreement (or any related agreement),*** any controversy or claim arising out of or relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this agreement is invalid, illegal, or otherwise voidable or void, as well as any claim that we violated any laws in connection with the execution or enforcement of this agreement and any claim for declaratory relief, will be sent to final and binding arbitration …" (emphasis added).

Ex. A to Defendant's Motion at pp. 13-14.

Under this provision, Defendant is free to pursue Plaintiffs at the courthouse on any claim for indemnification, trademark infringement, or monetary breach of the Franchise Agreement. Of course, there are no other claims that Defendant would likely bring. Any claim for a non-monetary breach of the agreement would simply result in a declaration of default and a termination of the Franchise Agreement, which is exactly what happened here. Defendant claimed that Plaintiffs failed to maintain the hotel to standard, declared a default, and terminated the franchise. If Plaintiffs failed to de-brand the hotel, then Defendant would have the right to sue in federal or state court for trademark infringement. Similarly, if Plaintiffs failed to pay Defendant any money due, then

Defendant would again have the right to sue, as in fact they did here as well.[3]  Plaintiff is precluded, however, from seeking a declaration from any court that Defendant's declaration of default and subsequent termination of the Franchise Agreement was wrongful or that Defendant's claim for monetary damages was pretextual.  Indeed, under the terms of the arbitration clause, Plaintiff would not even be entitled to file a counterclaim in the same suit if one were brought by Defendant.  Thus, as a matter of practical application, the arbitration clause only binds Plaintiffs and is entirely optional for Defendant. A more one-sided and unconscionable agreement would be hard to imagine.

### 3.    The Arbitration Clause Precludes Discovery.

The arbitration clause makes applicable the Commercial Arbitration Rules of the American Arbitration Association "***except*** to the extent that [those rules] may be interpreted to require you or use to produce documents, witnesses, or information at a time other than at a hearing on the claim ***without our mutual consent***."  Defendant's Ex. A at p. 14 (emphasis added).  In other words, the arbitration clause ensures trial by ambush whereas the Rules of Civil Procedure have since 1938 strived to avoid exactly that.  The very purpose of those rules is to ensure a "***just***, speedy, and inexpensive determination of every action."  FED. R. CIV. P. 1.  There can be nothing just about a trial conducted with no opportunity for discovery whatsoever, unless, of course, Defendant consents.

That injustice is even more egregious given the relative size of the parties.  Defendant is a multi-national corporation with access to all the documents, witnesses and information it cares to manufacture, whereas Plaintiffs are three individuals who run a single hotel in Amarillo, Texas.  Defendant has what it needs to present a case.  Plaintiffs have the right and need the ability to test Defendant's evidence through discovery.  Without depositions, Defendant needs not fear the prior

---

3 Having invoked the jurisdiction of the Court to assert its affirmative claims, Defendant should be held to have waived

inconsistent statement. Without document production, Defendant needs not fear the smoking gun. Without interrogatories or the mandatory disclosure available under the Federal Rules of Civil Procedure, Defendant needs not fear Plaintiffs ability to prepare for cross-examination since Plaintiffs will have no idea who Defendant intends to call as a witness. Even the limited discovery permitted in arbitration is a wonderland compared what the arbitration clause permits here.

Perhaps the most offensive part of this sub-clause is that discovery may only be had with Defendant's consent. Thus if discovery might be harmful to Defendant, it has only to say no to avoid that harm. Conversely, if Defendant wants discovery, it has only to say yes to get it. This type of oppression is unconscionable. In *Ferguson v. Countrywide Credit Industries, Inc.,* for example, the arbitration agreement at issue there limited the number of subjects that could be included in the deposition of a corporate representative, but did not similarly limit the subjects included in employee depositions. 298 F.3d 778, 786 (9th Cir.2002). Although the Ninth Circuit Court of Appeals held that the discovery provisions at issue in *Ferguson* were not per se unconscionable, the Court held that they did contribute to the overall pattern of unconscionability throughout that agreement. *Id.* at 787. Similarly, in *Hooters of America, Inc. v. Phillips,* the arbitration agreement at issue there contained two discovery requirements for the employee that did not apply to the employer. 173 F.3d 933, 938-39 (4th Cir.1999). That evidence contributed the 4th Circuit holding that the "The Hooters (sic) rules when taken as a whole, however, are so one-sided that their only possible purpose is to undermine the neutrality of the proceeding." 173 F.3d 933, 937 (4th Cir. 1999). The one-sided discovery restriction here likewise renders or contributes to rendering Defendant's arbitration clause as a whole unconscionably one-sided.

---

its asserted right to insist on arbitration.

4. **The Arbitration Clause Precludes Certain Claims.**

Plaintiff has pled breach of contract and violation of the Texas Deceptive Trade Practices Act. In the event Defendant proves that the substantive law of Maryland is different from the substantive law of Texas such that the substantive law of Maryland must apply, Plaintiff will assert a claim for deceptive trade practices under Maryland law. Plaintiff cannot, however, under the arbitration clause at issue, assert any claims for violation of Maryland's Franchise Registration and Disclosure Law. The choice-of-law provision of the arbitration clause provides that "nothing herein shall be construed to establish independently your right to pursue claims under Maryland's Franchise Registration and Disclosure Law." Defendant's Ex. A at p. 14. Although Plaintiffs have not asserted a claim under Texas' Business Opportunity Act, if they are precluded to do so by the arbitration clause, then they should not be precluded from applying the Maryland act. Candidly, it might not apply at all, but the arbitration clause seeks to preclude that option from the outset and is thus unconscionable in this respect as well.

5. **Arbitration Is Cost-Prohibitive.**

The arbitration clause requires Plaintiffs to pay substantial and prohibitive arbitration fees to the American Arbitration Association, and otherwise. The United States Supreme Court has recognized that the existence of large arbitration costs could preclude a litigant from vindicating a federal statutory right. *Green Tree Financial Corporation v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed 2d 373 (2000); *see also In Re FirstMerit Bank*, 52 S.W.3d 749, 756 (Tex. 2001). The plaintiffs in both the *Green Tree Financial* case and the *First Merit Bank* case failed to establish what the arbitration costs would be and the Courts, therefore, ordered arbitration. Plaintiffs here, however, have provided the Court with evidence of the exorbitant fees charged by the American

Arbitration Association applicable to this case.

The fees associated with the arbitration Defendant seeks to compel are governed by the AAA's Commercial Arbitration Rules and are directly related to the size of the claim. *See* Gibson Aff., Exhibit C, at ¶ 2. In this case, Plaintiffs have yet to calculate their damages with certainty, but those damages are expected to exceed $1,000,000, in which case Plaintiffs would be required to pay to the AAA a filing fee of $8,000 and a "case service fee" of $3,500. *Id.* Even if Plaintiffs' damages turned out to be between $500,000 and $1,000,000, then Plaintiffs would be required to pay a filing fee of $6,000 and a "case service fee" of $2,500. *Id.* Those fees alone are cost prohibitive. *See* Affidavits of Bikramjit Singh, Exhibit A hereto at ¶ 6 and Kuldip Deol, Exhibit B hereto at ¶ 6.

The parties must also pay the arbitrator's fee, which, from the panelists offered, range from $225 per hour to $3,000 per day. *See* Gibson Aff., Ex. C at ¶ 3. While it is difficult to determine precisely how long the arbitration of this case will take, at least one business week would not be at all unreasonable, in which case Plaintiffs can anticipate paying arbitrator fees of at least $5,500 to $11,900. *Id.* at ¶ 5. That does not, of course, include any pre- or post-arbitration hearings or deliberation time, for which the parties are also charged from $225 to $350 per hour. *Id.* at ¶ 2.

In contrast, the filing fee in this Court was $350.00 and the services of the Court's personnel and facilities have already been paid for through the parties' taxes. Any remaining filing fees are de minimus.[4]

The Franchise Agreement discloses no information whatsoever concerning the prohibitive cost of arbitration or that there are even any costs involved. Nor does that agreement inform Plaintiffs that whatever fees might be involved in arbitration would significantly exceed the cost of

---

4 The Court is requested to take judicial notice of its filing fee schedule.

filing suit in state or federal court. Defendant made no other disclosure to Plaintiff outside the Franchise Agreement concerning the cost of arbitration either. *See* Singh and Deol Affs., Exs. A & B at ¶ 5.

It is not surprising then that Plaintiffs never contemplated the imposition of such prohibitive fees. *See* Singh and Deol Affs., Exs. A & B at ¶ 5. Moreover, and more importantly, Plaintiffs simply cannot afford to participate in arbitration. *See* Singh and Deol Affs., Exs. A & B at ¶ 6.

Those within the legal profession may take the cost of arbitration for granted (at least those with significant litigation experience). Laymen, however, simply put, have no idea how much arbitration can cost. If they did, few would ever agree to it. By failing to disclose that Plaintiffs would be required to bear such large fees, Defendants concealed the practical impact of Defendants' arbitration clause and prevented Plaintiffs from making an informed decision whether to agree to arbitration. That lack of disclosure resulted in an impermissible surprise and is unconscionable. *See Myers v. Terminex*, 697 N.E. 2d 277, 281 (Ohio Ct. Comm. Pleas 1998) ("[Plaintiff] was unaware of the undisclosed arbitration requirements. Such exorbitant filing fees [of $2000], "agreed to" unknowingly, would prevent a consumer of limited resources from having an impartial third party review his or her complaint against a business-savvy commercial entity. Therefore...the undisclosed filing fee requirement . . . is so one-sided as to oppress and unfairly surprise [the plaintiff].").

In addition to the fees associated with the arbitration, which Defendant can easily afford even though Plaintiffs cannot, Defendant's arbitration clause builds in another advantage for Defendant, which was touched on above. By compelling arbitration in Maryland at Defendant's headquarters, Defendant avoids the expense associated with transporting and accommodating its witnesses and, most likely, its lawyers. Conversely, Plaintiffs will have to pay to transport, feed and house all of its

witnesses, including themselves, and their attorney.  *See* Gibson Aff., Ex. C at ¶ 6.  That expense alone could easily approach $10,000 assuming a day of travel on each end of a five-day arbitration. *Id.*  Defendant thus gets all the economic advantages of the home court, as well as the psychological and practical advantages discussed above.  Were the trial to be held in Dallas, however, the burden would be relatively equal for all parties.  Where ever the burden lies though, whether borne entirely by Plaintiffs or spread equally among the parties, it will absolutely be a factor in any settlement discussions the parties might have.[5]

A host of federal and state appellate courts have refused to enforce arbitration clauses that required plaintiffs to pay fees that might discourage or prevent a party from bringing a claim.  The Eleventh Circuit, for example, found unenforceable an arbitration clause that required claimants to pay a $2,000 filing fee and to bear potential responsibility for a portion of the arbitrator's fees.  The Eleventh Circuit held that "costs of this magnitude [are] a legitimate basis for a conclusion that the clause does not comport with statutory policy [enabling people subjected to workplace discrimination to vindicate their rights]."  *Paladino v. Avnet*, 134 F.3d 1054, 1062 (11th Cir. 1998) (Cox, J. concurring, for a majority of the court).

*Paladino* followed *Cole v. Burns International Security Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997), where, in a carefully reasoned opinion, Chief Judge Edwards held that an employee could not be required to pay an arbitrator's fee – which the court estimated to range from $500 to $1000 or more, daily – to pursue his discrimination claims, because the fees would discourage such an action and prevent him from vindicating his statutory rights.  Ultimately, the court interpreted an

---

5 Having had the pleasure of trekking to Abilene three times for trial with the executive office of a major oil-company based in Dallas in tow, counsel is well aware of the role inconvenience plays in settlement discussions.

ambiguous provision in the agreement to require the employer to pay all of the arbitrator's fees, and so found the agreement enforceable. *Cole*, 105 F.3d at 1485.)

In *Shankle v. B-G Maintenance Management of Colorado*, 163 F.3d 1230 (10th Cir. 1999), the court examined an arbitration agreement governing an employment relationship. The court refused to compel arbitration where the claimant would be required to pay one-half of the arbitrator's fees – an amount projected to total between $1,875 and $5,000 – to resolve a discrimination claim against his employer. The court found that the agreement was unenforceable, "plac[ing] Mr. Shankle between the proverbial rock and a hard place – it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum." 163 F.2d at 1235.

These three federal court of appeals decisions are only part of a body of decisions striking down arbitration clauses as unconscionable where those clauses require claimants to pay substantial fees. *See Horenstein v. Mortgage Market, Inc*., No. 98-1104-AA (D. Or. 1999) (finding unenforceable arbitration agreement that required claimants to pay share of arbitrator's fees, regardless of possibility that cost of fees might be recovered in subsequent award); *Martens v. Smith Barney, Inc*., 181 F.R.D. 243, 255-56 (S.D.N.Y. 1998) (stating "arbitration agreement cannot impose financial burdens on plaintiff access to the arbitral forum" including steep filing fees and arbitrators' fees); *Patterson v. ITT Consumer Financial Corp*., 18 Cal. Rptr. 2d 563, 566-67 (Cal. App. 1993) (refusing to compel arbitration of modest consumer claims where claimants were required to pay fees on grounds of unconscionability), review denied, 1993 Cal. LEXIS 4322 (Aug. 12, 1993), cert. denied, 510 U.S. 1176 (1994); *Spence v. Omnibus Indus.*, 119 Cal. Rptr. 171, 173-73 (Cal. App. 1975) (refusing to require plaintiff seeking judicial resolution of $37,000 claim against building

contractor to pay $720 filing fee to submit claim to arbitration); *Brower v. Gateway* 2000, 676 N.Y.S.2d 569, 574 (N.Y. App. 1998) (finding that "excessive cost factor [of approximately $5000] that is necessarily entailed" rendered provision requiring arbitration in an International Chamber of Commerce forum unconscionable); *In Matter of Arbitration between Teleserve Systems Inc. and MCI Telecommunications Corp.*, 659 N.Y.S. 2d 659, 660, 664 (N.Y. App. 1997) (finding filing fee calculated on basis of one-half percent of the amount claimed – $204,000 fee in a $40 million anti-trust dispute – patently excessive, oppressive, burdensome and a bar to arbitration and therefore unconscionable in contract between sophisticated telecommunications firms); *Myers v. Terminex*, 697 N.E.2d at 280-81 (holding unconscionable arbitration clause that would require claimant to pay a filing fee of $2000 to pursue claim worth approximately $120,000).

Apparently, no Maryland appellate court has addressed the question of excessive arbitration fees in a published opinion. In light of the numerous cases cited above, however, this Court should follow the body of Maryland law establishing that a contract for the sale of goods that bars all remedies and avoids all damages is unconscionable. *See Martin Marietta v. Internat'l Telecommunications Satellite Org.*, 991 F. 2d 94, 100 (4th Cir. 1992) (applying Maryland law, the court concluded that a contract provision waiving claims that might arise under contract, negligence and strict liability theories was against public policy and could not be enforced to block claims for gross negligence) (citing *State Highway Admin. v. Greiner Eng'g Sciences*, 83 Md. App. 621, 577 A. 2d 363, cert. denied, 321 Md. 163, 582 A.2d 499 (1990) and *Boucher v. Riner*, 68 Md. App. 539, 514 A. 2d 485 (1986)). Here, because of the exorbitant cost of the arbitration, which totaled could exceed $30,000 exclusive of attorney's fees, Defendant's arbitration clause will effectively bar Plaintiffs' remedy and is, therefore, unconscionable.

6.      **The Arbitration Clause Wrongfully Denies Plaintiffs' Right to Trial by Jury.**

The Seventh Amendment to the United States Constitution ensures Plaintiffs the right to a trial by jury. So important is that right that Thomas Jefferson viewed it as "the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."

While constitutional rights may be waived contractually, they may ***only*** be waived if done so voluntarily, intentionally, and knowingly, in other words, with full awareness of the legal consequences. *D. H. Overmeyer Company, Inc. vs. Frick Company*, 405 U.S. 174 (1972). Nowhere in the Franchise Agreement were Plaintiffs advised that by signing that agreement, they were waiving their constitutional right to trial by jury. Nor were Plaintiffs informed by Defendant in any other manner that signing the Franchise Agreement with Defendant's arbitration clause would waive their Constitutional right to a trial by jury. *See* Singh Aff., Ex. A at ¶ 7; Deol Aff., Ex. B at ¶ 7.

The invocation of the arbitration clause in this case involves the waiver of a fundamental right – the right to trial by jury. Article 23 of the Maryland Declaration of Rights provides that "[t]he right of trial by Jury of all issues of fact in civil proceedings...shall be inviolably preserved." The Maryland Court of Appeals has explained that this right, like that guaranteed by the Seventh Amendment to the United States Constitution, "requires that 'enjoyment of the right...be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with.'" *Attorney General v. Johnson*, 282 Md. 168, 274, 291, 385 A.2d 57, 67 (1978), overruled on other grounds, *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991). There can be no dispute that enforcement of Defendants' Arbitration Clause would deny Plaintiffs the right to a trial by jury.

Like that of other states, Maryland's law of contracts holds that any contract obligating one party to waive a constitutional right is only valid if the waiver is voluntary, knowing and intelligent.

*See Meyer v. State Farm Fire and Casualty Co.*, 85 Md. App. 83, 90, 582 A.2d 275, 278 (1990).[6]

This principle has been recognized in numerous cases around the United States. *See Western Nat'l Mutual Ins. Fund v. Lennes (In re Workers Compensation Refund),* 46 F.3d 813, 819 (8th Cir. 1995) ("Contractual clauses purporting to waive constitutional rights must be clear and unambiguous"); *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3rd Cir. 1988) ("constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver."); *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 756 (6th Cir. 1985) ("Those cases in which the validity of a contractual waiver of jury trial has been in issue have overwhelmingly applied the knowing and voluntary standard."); *In re Hannie*, 476 P.2d 110, 113 (Cal. 1970) ("A trial by jury may be waived . . . . Waivers of constitutional and statutory rights must be voluntary . . ., and 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences") (citations omitted). *See also Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir. 1995) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.") (citations omitted).

In the landmark case of *Badie v. Bank of America*, the California Court of Appeals noted that "[i]n order to be enforceable, a contractual waiver of the right to a jury trial 'must be clearly apparent in the contract and its language must be unambiguous and unequivocal, leaving no room

---

6 While *Meyer* recognizes the constitutional principle cited, the court was not required to apply that principle in the facts in that case. In Meyer, an insurance policy required insureds to submit to an appraisal process before they could bring a suit in court. The court found that this policy did not involve a waiver of the right to trial by jury, because the insureds could always sue in court after the appraisal process. If the defendants here succeed in enforcing Defendants' Arbitration Clause, however, plaintiffs will have no day in court whatsoever. Under these circumstances, therefore, Meyer requires that plaintiffs must have knowingly, voluntarily and intelligently agreed to Defendants' Arbitration Clause before that

for doubt as to the intentions of the parties." 79 Cal. Rptr.2d 273, 289 (Cal. Ct. App. 1998), rev.

denied, 1999 Cal. LEXIS 1198 (Feb. 24, 1999). The Court went on to hold that "absent a clear

agreement to submit disputes to arbitration or some other form of ADR, we cannot infer that the

right to a jury trial has been waived." *Id.* at 290. The Court based its conclusion on the fundamental

nature of the right to a jury trial (which is also guaranteed by the Maryland Constitution):

> In light of the importance of the jury trial in our system of jurisprudence, any waiver
> thereof should appear in clear and unmistakable form. Where it is doubtful whether
> a party has waived his or her constitutionally-protected right to a jury trial, the
> question should be resolved in favor of preserving that right.

*Id.* (citation omitted).

In contrast, consider the States Supreme Court's decision in *Green Tree Financial*

*Corporation v. Randolph*, 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000), in which the Court

upheld an arbitration provision that expressly advised the plaintiff/consumer in writing that they

were waiving their right to trial by jury. In *Greentree*, the notice was capitalized in order to draw

the consumer's attention to that fact and ensure that a knowing waiver was obtained. There is no

such notice in the arbitration clause at issue and Plaintiffs had no idea they were waiving their right

to trial by jury. *See* Singh Aff., Ex. A at ¶ 7; Deol Aff., Ex. C at ¶ 7.

---

clause may be enforced.

## __The Franchise Agreement is a Contract of Adhesion.__

In considering the issue before the Court, the Court should bear in mind the relative disparity in bargaining power between Plaintiffs and Defendant. Defendant prepared the Franchise Agreement and allowed no changes to it. *See* Singh Aff, Ex. A at ¶ 4; Deol Aff., Ex. B at ¶ 4.

Defendant is a massive multi-national corporation, franchising more than 5,300 hotels, representing more than 430,000 rooms, in the United States and more than 40 countries and territories. As of September 30, 2006, 736 hotels are under development in the United States, representing 57,117 rooms, and an additional 72 hotels, representing 6,462 rooms, are under development in more than 20 countries and territories. The company's Cambria Suites, Comfort Inn, Comfort Suites, Quality, Clarion, Sleep Inn, Econo Lodge, Rodeway Inn, MainStay Suites and Suburban Extended Stay Hotel brands serve guests worldwide.[7] Choice Hotels' franchise revenues alone exceeded $116,000,000 for the quarter ending March 31, 2007.[8] It had additional marketing and reservations revenues of $62,000,000 for that same quarter.[9]

Plaintiffs, on the other hand, are three Indian immigrants who wanted to run a single motel in Amarillo, Texas. Suffice it to say, there is a tremendous disparity in bargaining power. Their only choice was to sign the agreement put before them or not. While this factor alone is not dispositive, the Court should recognize and consider this disparity.

---

7 Statistics courtesy of http://investor.choicehotels.com/phoenx.zhtml?c=99348&p=irol-irhome.
8 *See* Choice Hotels' quarterly SEC filing at http://investor.choicehotels.com/phoenix.zhtml?c=99348&p=irol-SECText&TEXT=aHR0cDovL2NjYm4uMTBrbd2l6YXJkLmNvbS94bWwvZmlsaW5nLnhtbD9yZXBvPXRlbmsmaXBh Z2U9NDkxMDU1MCZkb2M9MSZudW09MjQ=
9 See Choice Hotels' quarterly SEC filing at http://investor.choicehotels.com/phoenix.zhtml?c=99348&p=irol-SECText&TEXT=aHR0cDovL2NjYm4uMTBrbd2l6YXJkLmNvbS94bWwvZmlsaW5nLnhtbD9yZXBvPXRlbmsmaXBh Z2U9NDkxMDU1MCZkb2M9MSZudW09MjQg=

## Conclusion

The United States Supreme Court has repeatedly stressed that "arbitration under the [Federal Arbitration Act] is a matter of consent, not coercion." *Allied-Bruce Terminex Cos. v. Dobson,* 513 U.S. 265, 270 (1995). In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), the Supreme Court emphasized that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." The Court went on to elaborate in *First Options* that "the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts, 'are enforced according to their terms,' and according to the intentions of the parties." 514 U.S. at 947 (citations omitted). *See also Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 479 (1989) ("Arbitration . . . is a matter of consent, not coercion . . ."); *AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 648-49 (1986) ("[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit . . . .[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.") (citations omitted).

Defendant's arbitration clause is so one-sided and so burdened with undisclosed consequences – exorbitant expense and waiver of the right to trial by jury, as to be unconscionable. Moreover, given that exorbitant expense, to enforce Defendant's arbitration clause, would be to deny Plaintiffs' any redress for Defendant's wrongs.

**WHEREFORE**, Plaintiffs pray that the Court deny Defendant's Motion to Compel Arbitration

and Dismiss or Stay Litigation and grant such other relief, at law or in equity to which Plaintiff may be justly entitled. In the alternative, should the Court grant Defendants' Motion to Compel Arbitration, Plaintiffs request the Court to exercise judicial control over the discovery process, order the Rules of Evidence and Procedure to apply to the arbitration proceeding, require that all costs of arbitration be paid by Defendant, and that the arbitration be held in Dallas, Texas.

Respectfully submitted,

_____

David R. Gibson
Texas Bar No. 07861220
445 E. FM 1382, Ste. 3363
Cedar Hill, TX 75104
(214) 697-3034
(972) 291-0636 Facsimile

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

On this 4th day of June 2007, a copy of the foregoing instrument was served on Defendant as set forth below:

**VIA FACSIMILE (512) 480-5033**

Elizabeth G. Block
Brown McCarroll, L.L.P.
111 Congress Ave., Ste. 1400
Austin, Texas 78701

_____

David R. Gibson